UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MARK TOSCANO,                           :       Civil Action No. _____
                                        :
                    Plaintiff,          :       **COMPLAINT AND JURY DEMAND**
                                        :
       -v.-                             :
                                        :
BROOKHAVEN SCIENCE                      :
ASSOCIATES, LLC,                        :
                                        :
                    Defendant.          :
-------------------------------------------------------X

Plaintiff MARK TOSCANO, by and through his attorneys, LAW OFFICES OF SHELDON KARASIK, P.C., as and for his Complaint against Defendant BROOKHAVEN SCIENCE ASSOCIATES, LLC, states as follows:

## THE PARTIES

1. Plaintiff MARK TOSCANO ("Plaintiff") is an individual residing at 3 Wexford Court in St. James, NY 11780, which is in Suffolk County.

2. Defendant BROOKHAVEN SCIENCE ASSOCIATES, LLC ("BSA") is a limited liability corporation maintaining its principal place of business at 2 Center Street, Upton, Suffolk County, NY 11973 (P.O. Box 5000, Upton, NY, 11973). BSA is a partnership between the Battelle Memorial Institute ("Battelle"), a corporation headquartered at 505 King Avenue, Columbus, OH 43201, and the Research Foundation for the State University of New York ("RFSUNY"), headquartered at 35 State Street, Albany, NY 12207 (P.O. Box 9, Albany, NY 12201).

3. The Brookhaven National Laboratory ("BNL") is a Department of Energy ("DOE") facility located in Upton, New York. The BNL campus has approximately 2,400 BSA employees,

35 DOE employees and several hundred contractors on-site. BNL operations, facilities, and personnel are overseen by Defendant, Brookhaven Science Associates, LLC, a federal contractor.

## JURISDICTION AND VENUE

4. Jurisdiction in this Court is based upon 28 U.S.C. § 1331 as it involves a federal question pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA").

5. Venue lies in this federal judicial district pursuant to 28 U.S.C. §1391(b)(1) in that Defendant's primary place of business is in Suffolk County, which is in the Eastern District of New York, as provided in 28 U.S.C. §1391(d).

## BACKGROUND

6. Plaintiff, a licensed New York State Professional Engineer and practicing Catholic, began working at the Brookhaven National Laboratory ("BNL") in February 1989.

7. At all relevant times, Plaintiff was 61 years old and had worked at the BNL facility for almost 33 years. He was a consistently high performer during his decades of service: he received excellent performance reviews (almost always attaining the top/best rating possible), was never subjected to any disciplinary action, and was awarded serval service awards, including the top Brookhaven Award for exemplary contributions to BNL. In accordance with his impeccable performance record, Plaintiff received annual bonuses nearly every year since the early 2000's.

8. At the time of his ouster, Plaintiff's title was Manager of Energy Management and Utilities Engineering. This position primarily required Plaintiff to work at a computer. When he was on-site at BNL, the workspace provided for him was a private office with floor to ceiling walls and doors in a ~2000 square foot building. The building was mechanically ventilated with outside

air and had operating windows. He shared it with three other employees who also had similar workspaces.

9. As Manager of Energy Management and Utilities Engineering, Plaintiff supervised five (5) professional employees. Plaintiff's position came with a salary of approximately $197,000, retirement contributions, and medical benefits.

**BSA's Vaccination Mandate**

10. In September 2021, Defendant, Brookhaven Science Associates, LLC ("BSA"), enacted a mandatory vaccination policy for all BNL personnel, including federal employees, contractors, and subcontractors (the "Vaccine Mandate"). This policy enacted a "requirement that all employees, including remote employees, must be vaccinated as a condition of employment, effective November 17, 2021."

11. To be effectively "vaccinated" per the BSA policy, persons employed on the BNL campus were required to "validate" that they "have been vaccinated with both shots of either the Pfizer/BioNTech or Moderna vaccines or the first and only shot of the Johnson & Johnson vaccine." Workers were required to start the vaccination process by November 17, 2021, and to have completed a two-dose regimen by December 17, 2021.

12. BSA suggested to employees that the Vaccination Mandate was "flowed down" from a federal mandate. In reality, the "flow down" correspondence merely suggested that contractors and other personnel should endeavor to be vaccinated against Covid-19. BSA was not legally obligated to enact the Vaccine Mandate and was under no illusion that such legal obligation existed.

13. In conjunction with the Vaccine Mandate, BSA also enacted a vaccination-status badge system, causing BNL personnel to wear brightly colored orange and blue badges (indicating Covid-19 vaccination status) while on BNL grounds.

14. In an email dated September 22, 2021, employees and contractors at the BNL facility were told that BSA would make "reasonable accommodations" to the Vaccine Mandate for personnel seeking to avoid the Pfizer/BioNTech, Moderna, and Johnson & Johnson injections on medical or religious grounds. Exemption requests were due on October 11, 2021. BSA promised that final decisions on all exemption requests would be communicated by November 3, 2021.

15. Complete exemption, to be granted or denied at the discretion of a BSA agent, was the only accommodation offered by BSA: the Vaccine Mandate did not allow for N95 masking, remote work, or periodic testing alternatives to the jab. If unable to obtain a medical or religious exemption, workers were required to either vaccinate or be subjected to involuntary "resignation."

16. On October 8, 2021, Plaintiff timely submitted two accommodation requests for exemption from the Vaccine Mandate: a request for a medical exemption ("ME") and a request for a religious exemption ("RE").

**Plaintiff's Medical Exemption Request**

17. Plaintiff sought a medical exemption from Defendant because, after consulting his primary care physician and considering a variety of health factors, it was determined that the benefits to Plaintiff of a Covid-19 vaccine regimen were, given the totality of circumstances, outweighed by his particularly high risk of negative side effects.

18. Plaintiff's ME request included a letter from his primary care doctor indicating, among other things, a history of deep vein thrombosis ("DVT") resulting from a previous vehicle accident. The letter indicated that Plaintiff's medical condition made him particularly susceptible to blood clots, a known side effect of the Covid-19 vaccines. "If you require further information," Plaintiff's primary care physician concluded, "please do not hesitate to contact our office."

19. DVT is a serious medical condition in which blood clots form in veins, usually originating in the lower extremities. These blood clots can cause pain, swelling, and cramping, making it difficult for the afflicted person to stand or sit for long periods of time. Clots can also dislodge and travel through the bloodstream, which can cause a pulmonary embolism (venous thromboembolism), a life-threatening condition. www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557. DVT is associated with Chronic Venous Insufficiency ("CVI"), a "disabling condition" listed in the SSA Blue Book. https://thrombosis.org/2019/11/social-security-disability-benefits-after-a-blood-clot-are-you-eligible/.

20. Thrombosis blood clots are known to be a risk factor for Covid-19 inoculation treatments, which can cause serious complications including Thrombosis with Thrombocytopenia Syndrome (TTS) and Vaccine-Induced Thrombocytopic Thrombosis ("VITT"). These complications are often deadly: the FDA has found that "individuals with TTS may rapidly deteriorate, despite prompt diagnosis and treatment, that TTS can lead to long-term and debilitating health consequences and that TTS has a high death rate." FDA, *Coronavirus (COVID-19) Update: FDA Limits Use of Janssen COVID-19 Vaccine to Certain Individuals* (May 5, 2022) (www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-limits-use-janssen-covid-19-vaccine-certain-individuals).

a. It is well-documented that thrombosis-related adverse reactions can be caused by "viral-vector vaccines" such as those produced by Johnson & Johnson ("J&J") and AstraZeneca. Akuna et al., *VITT Reaction Associated with Johnson & Johnson Covid-19 Vaccine*, 160 CHEST No. 4 (Oct 1, 2021) (DOI: https://doi.org/10.1016/j.chest.2021.07.764) (case study of a patient with DVT).

b. The cause of thrombosis-related adverse reactions is unknown, as is the risk of adverse reactions from mRNA vaccines. There is, however, some evidence that mRNA vaccines can cause serious thrombosis-related complications. *See*, *e.g.*, Hippisley-Cox et al., *Risk of Thrombocytopenia and Thromboembolism After Covid-19 Vaccination and SARS-CoV-2 Positive Testing*, 374 BMJ 1931 (27 August 2021) (doi: https://doi.org/10.1136/bmj.n1931) ("Increased risks of haematological and vascular events that led to hospital admission or death were observed for short time intervals after first doses of the [Pfizer/BioNTech] mRNA vaccines.")

c. FDA approval is not dispositive of a treatment's safety for individuals; the agency has allowed the use of Covid-19 treatments on the basis of public health despite "known and potential risks" to individuals susceptible to thrombosis.

   i. On April 13, 2021, two months after FDA approval, the agency recommended a pause in use of the J&J shot due to reports of serious side effects relating to thrombosis. The pause was lifted on April 23, 2021, on the basis that "the known and potential benefits of Janssen COVID-19 Vaccine outweighed its known and potential risks in individuals 18 years of age and older." FDA, *Coronavirus (COVID-19) Update*, *supra*.

   ii. On May 5, 2022, a year after lifting the pause, the FDA rescinded general authorization for the J&J vaccine, acknowledging that it causes TTS and poses a serious health risk: "FDA has determined that the risk of thrombosis with thrombocytopenia syndrome (TTS), a syndrome of rare and potentially life-threatening blood clots in combination with low levels of blood platelets with onset of symptoms approximately one to two weeks following administration of the Janssen COVID-19 Vaccine, warrants limiting the authorized use of the vaccine." *Id.* This change was not precipitated by new data; in fact, the FDA acknowledged that "reporting rates of TTS and TTS deaths following administration of the Janssen COVID-19 Vaccine are not appreciably lower than previously reported." *Id.*

21. Plaintiff did not receive a response to his ME petition on or before Defendant's self-imposed deadline of November 3, 2021. On November 4, Plaintiff sent a note to his supervisor indicating that he had not received any correspondence on the status of his ME.

22. Later in the afternoon of November 4, 2021, Plaintiff received an email from Al Reilly, Director of BNL's Occupational Medicine Clinic, denying his request. It stated that:

> "After review, your request for exemption was denied. The rationale behind your request for exemption for the COVID vaccination requirement is not a medical contraindication based upon valid reasons, as enumerated by the Advisory Committee on Immunization Practices of the United States Public Health Service and guidance from the United States Centers for Disease Control."

23. The United States Public Health Service ("USPHS") is not a regulatory agency; it is a branch of the nation's uniformed services. Officers of the USPHS Commissioned Corps serve as physicians, nurses, dentists, veterinarians, scientists, engineers in other regulatory agencies.

They report to the U.S. Surgeon General. www.usphs.gov/about-us. The USPHS does not have an "Advisory Committee on Immunization Practices" and does not promulgate information regarding Covid-19 inoculations.

24. The Centers for Disease Control and Prevention ("CDC") is not a regulatory agency and does not provide guidance on "valid reasons" for medical exemptions. Although part of the federal executive branch, the CDC and its subunits are not statutorily authorized to regulate primary care physicians and do not purport to be authorities in individualized medical care. www.cdc.gov/vaccines/acip/committee/charter.html. *See also* National Academy of Sciences, *CDC Recommendations* (1996) https://www.ncbi.nlm.nih.gov/books/NBK233067/ ("CDC is not a regulatory agency and has no regulatory authority, even though it does have a public health mandate. Thus, the only way that CDC can exert influence is to build consensus.")

25. Defendant refused to elaborate on its denial of Plaintiff's ME request and made no attempt to understand or accommodate Plaintiff's medical condition. Among other things:

   a. Defendant did not engage in any "interactive" dialogue with Plaintiff regarding accommodations or exemptions.

   b. Defendant's reviewing doctor never requested supplemental information on Plaintiff's condition or concerns.

   c. Defendant made no attempt to contact Plaintiff's primary care physician.

**Plaintiff's Religious Exemption Request**

26. Plaintiff sought a religious exemption from vaccination due to his conscientious objection to medical or scientific research derived from the fruits of abortion procedures. This

religious objection is rooted in Plaintiff's Catholic faith and in his sincere belief that life begins at conception.

27. On October 8, 2021, Plaintiff submitted a request for religious exemption pursuant to a form sent to him by Defendant on October 4. The October 4 form promised that "accommodation will be granted if 1) you have a sincerely held religious belief that prohibits you from becoming vaccinated" as long as "2) The accommodation of your religious belief will not result in undue hardship for BSA or create safety and health risks to others."

28. Plaintiff's RE request stated, in relevant part: "I am not able to receive a COVID-19 vaccine because to do so would violate my sincerely and deeply held religious beliefs. All currently available COVID-19 vaccines used cell lines originating from aborted children in their manufacturing and/or testing."

29. Defendant responded to Plaintiff's request by demanding that he disclose his personal medication history via a "medication matrix" in order to be eligible for a religious exemption.

    a. The medication matrix was comprised of a spreadsheet of medications, including psychiatric medications, which were purportedly developed using cell lines originating from abortion procedures.

    b. In addition to being a deeply intrusive violation of Defendant's privacy, the medication matrix was a bad faith "gotcha!" on the part of the employer. Its only conceivable purpose was to cast Plaintiff as a hypocrite if he took any of the enumerated medications.

    c. Notwithstanding the impropriety of Defendant's request, Plaintiff, anxious to avoid conflict and to keep his job, complied with this demand.

30. Defendant did not otherwise engage in any dialogue with Plaintiff regarding his religious beliefs or RE request:

    a. It did not solicit any further information or ask Plaintiff to elaborate on his request.

    b. It did not indicate that the RE petition was incomplete or inquire into possible accommodations that might be amenable to both parties.

    c. It did not indicate that accommodation of Plaintiff's RE would cause any particular hardship as a result of Plaintiff's role.

31. On October 29, 2021, a list RE approvals was circulated among BNL employees and contractors. Plaintiff's name was on that list, indicating that he would receive an exemption. That afternoon, Plaintiff was informed by his immediate supervisor, Chris Bruno, that he would receive an RE and would not be required to obtain a Covid-19 vaccination.

32. On November 3, 2021, however, Plaintiff received an email stating that RE decisions had been delayed and would not be available by Defendant's self-imposed deadline.

33. On November 4, Plaintiff was informed that his RE request had been denied. Writing on behalf of the organization, Robert E. Lincoln, Chief Human Resources Officer & Associate Laboratory Director, wrote that "BSA has carefully considered your request, and after engaging in the interactive dialogue with you, it has determined that it is unable to approve your accommodation request because, among other things, the information you provided does not demonstrate your entitlement to a religious accommodation." Mr. Lincoln provided no information as to how BSA came to this conclusion.

**Aftermath**

34. Although Plaintiff's ME and RE requests were summarily denied on November 4, 2021, the same was not true of all similarly situated personnel. Other workers' ME requests were apparently granted and coworkers who submitted nearly identical or very similar religious exemption requests were granted an RE. That same day, Nov 4, BSA issued updated guidance for unvaccinated workers directed particularly at those who had received ME and RE accommodations, stating:

> "Depending upon the unique circumstances of your work, you may be required to be fitted for and wear respirators, KF94, or ATMF3529 masks, or other personal protective equipment (PPE). Your manager will be in contact with you about such increased PPE requirements, if applicable to you."

Plaintiff's supervisor did not contact him indicating that his circumstances warranted these PPE requirements.

35. Following his ME and RE denials, Plaintiff sought to engage with Defendant to clarify that bases for the rejections and to cure any deficiencies. Defendant did not engage in any interactive dialogue to this end.

36. Plaintiff offered up several alternative accommodations that would be acceptable to him and would avoid any of Defendant's reasonable concerns, to no avail.

    a. Plaintiff offered to work from home and test for any times he needed to be on the BNL site. This accommodation was denied.

    b. Plaintiff offered to work as a term contractor and test as necessary. This accommodation was also denied.

    c. Plaintiff offered to work as a consultant to a BNL subcontractor. This, too, was denied.

37. On November 22, 2021, Plaintiff, through a lawyer, appealed the denial of his RE and ME requests and solicited further information regarding the bases of those denials. This appeal

11

noted that BSA granted the RE and ME requests of other BNL personnel and that BSA's treatment of Plaintiff's requests was irregular and its denial of his request was the exception, not the rule. It specifically noted that younger personnel and those with different religious tenets were not subjected to the same scrutiny and hostility throughout the accommodation request process.

38. Rather than engage in a good-faith conversation about Plaintiff's ME and RE requests, Defendant issued Plaintiff an ultimatum: vaccinate or resign.

39. When Plaintiff indicated that he would not subject to vaccination, BSA responded with hostility and demanded his resignation. His employment was effectively terminated on December 12, 2021. His resignation was tendered, under duress, on December 14, 2021.

40. Thereafter, Defendant denied Plaintiff unemployment benefits on the grounds that he had resigned voluntarily and for no good cause.

**Consequences and Legal Recourse**

41. As a result of Defendant's arbitrary and humiliating accommodation process, his ouster from a 33-year career at BNL, and the subsequent denial of unemployment benefits, Plaintiff has suffered acute financial insecurity, severe emotional distress, and physical ailments.

    a. Plaintiff suffered months of anxiety resulting in insomnia, lightheadedness, and difficulty concentrating.

    b. These issues compound and are compounded by Plaintiff's medical condition.

42. On January 12, 2022, Plaintiff filed a complaint with the New York State Division of Human Rights.

43. On February 8, 2022, Plaintiff filed a charge of employment discrimination (Charge No. 520-2022-06010) against Defendant with the U.S. Equal Employment Opportunities Commission ("EEOC").

44. On July 21, 2022, EEOC issued a "right to sue" letter to Plaintiff. This action is filed pursuant thereto.

**FIRST CAUSE OF ACTION**
**Disability Discrimination – ADA**

45. Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

46. Plaintiff is protected by the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA") from disability discrimination in the workplace. The ADA specifically provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101. It provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112.

47. Defendant is a "covered entity" pursuant to 42 U.S.C. §12111 that is subject to ADA jurisdiction because it is an "employer" as defined by the ADA ("a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year").

48. Plaintiff is "disabled" within the meaning of 42 U.S.C. §12102, which defines disability as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

    a. Plaintiff has chronic deep vein thrombosis ("DVT"), a serious medical condition that constitutes a disability within the meaning of the ADA.

    b. DVT makes it difficult and dangerous for the afflicted person to stand or sit for long periods of time. Standing and sitting are "major life activities" within the meaning of the ADA.

    c. DVT is also associated with Chronic Venous Insufficiency ("CVI"), a "disabling condition" listed in the SSA Blue Book.

49. As a result of his disability, Plaintiff could not safely obtain "vaccinated" status because Plaintiff's condition, in conjunction with other health factors, made it dangerous and medically inadvisable for him to receive a Covid-19 vaccination.

    a. Plaintiff's DVT puts him at high risk for blood clots, which are a known and serious side effect of both viral-vector and mRNA vaccines.

    b. Blood clots can dislodge and travel through the bloodstream to the lungs, causing pulmonary embolism – a life-threatening condition.

    c. After consulting Plaintiff's entire health record, his primary care physician determined that vaccination was not in the best interests of his medical care.

50. Plaintiff was otherwise qualified to perform the essential functions of his job with or without a reasonable accommodation.

51. Plaintiff suffered adverse action by being discharged from his employment due to his disability. Among other things, Defendant and its agents subjected him to terms and conditions of his employment that were different from those of persons without disabilities and which were intolerable and amounted to constructive discharge.

52. Defendant failed to reasonably accommodate Plaintiff's disability, as required by law.

53. Due to Defendant's willful violations of the ADA, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

**SECOND CAUSE OF ACTION**
**Religion Discrimination - Title VII**

54. Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

55. Plaintiff is protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") from discrimination in his workplace based on his religion. The statute provides that it is an unlawful employment practice "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2.

56. Defendant is Plaintiff's employer pursuant to Title VII and is within the jurisdiction of the statute. The statute provides that "employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. §2000e.

57. Plaintiff was subjected, by Defendant and its agents, to discrimination based on his religion when Defendant forced him to fill out the "medication matrix" as a condition of his employment, when Defendant denied his request for a religious exemption, and when Defendant terminated his employment.

58. Plaintiff was qualified for his position.

59. Plaintiff suffered adverse actions when he was forced to disclose his medical history as a result of his request for a religious exemption, when he was forced to choose between his job and his sincerely held religious beliefs, and when he was constructively terminated from his employment due to his religion.

60. Additionally, Defendant and its agents subjected Plaintiff to terms and conditions of his employment that were different from those of persons of different religions, and which were intolerable and amounted to constructive discharge.

61. Defendant failed to reasonably accommodate Plaintiff's religious beliefs, as required by law, and terminated him under circumstances which were discriminatory in nature.

62. Due to Defendant's willful violations of Title VII, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

### THIRD CAUSE OF ACTION
### Age Discrimination – ADEA

63. Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

64. Plaintiff is protected by the Age Discrimination in Employment Act of 1967 § 2, 29 U.S.C. § 621 et seq. ("ADEA") from discrimination in his workplace based on his age. The statute provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" or "to limit, segregate, or classify his employees in any way which would deprive or tend to

deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a).

65. Defendant is Plaintiff's employer pursuant to the ADEA and is within the jurisdiction of the statute. The statute provides that "employer" means "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year" and "any agent of such a person." 29 U.S.C. § 630.

66. Plaintiff faced age discrimination throughout the exemption request process, which culminated in the rejection of his requests for accommodation and his termination from a 33-year career at BNL, when Defendant and its agents directed more hostility at him than at younger coworkers undergoing the same process and when it rejected his accommodation requests while accommodating younger employees who were similarly situated.

67. Plaintiff was sixty-one (61) years old at the time of the events set forth herein.

68. Plaintiff was qualified for his position.

69. Defendant and its agents subjected Plaintiff to terms and conditions of his employment that were different from those of younger persons, and which were intolerable and amounted to constructive discharge.

70. Plaintiff suffered adverse actions when his ME and RE requests were denied and when he was constructively terminated from his employment.

71. Plaintiff's treatment at the hands of Defendant was unlike the treatment of younger but otherwise similarly situated individuals.

72. Due to Defendant's willful violations of the ADEA, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against Defendant:

A. Enter judgment on the First Cause of Action declaring that Defendant has violated the anti-discrimination provisions of applicable law; declaring that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to his former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

B. Enter judgment on the Second Cause of Action declaring that Defendant has violated the anti-discrimination provisions of applicable law; declaring that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to his former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

      C.      Enter judgment on the Third Cause of Action declaring that Defendant has violated the anti-discrimination provisions of applicable law; declaring that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be reinstated to his former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 19, 2022

                            LAW OFFICES OF SHELDON KARASIK, P.C.
                            Attorneys for Plaintiff

                            By: /s/ *Sheldon Karasik*
                                Sheldon Karasik (SK-4020)
                                1127 Fordham Lane
                                Woodmere, New York 11598
                                Direct Dial: (917) 587-8153
                                Email: sgklawfirm@gmail.com

                            By: /s/ *Robert Moraco*
                                Robert Moraco (RM-7139)
                                Of Counsel:
                                Livoti, Bernstein & Moraco, P.C.,
                                 c/o
                                Robert F Moraco
                                33 Gordon Avenue
                                Bedford NY 10506